The next case will be 09-1556, Transocean Deepwater Drilling v. Maersk Contractors. Thank you, Judge Mayer. May it please the court. Unless the court wishes me to go in a different order, I think the order that I'll take in my argument this morning will be to start with the district court's obviousness ruling, continue with the district court's non-enablement ruling, and then address the non-infringement ruling, leaving other issues to the briefs. None of those was an appropriate ruling, and particularly not so on summary judgment. Let me start, if I could please, with the obviousness ruling. The difficulties of drilling for oil a mile or more down below the sea level has unfortunately become front page news over the last few weeks. Well, if you're starting with current events, I don't see how you're possibly in 15 minutes going to get anywhere near the volume of material you need to cover. I'm not going to rehearse what the New York Times is covering, Judge Moore, but what I will point out is that this does frame the context for what we're talking about. We are talking about drilling for oil deep under the sea. In 1996, Transocean and its engineers invented an apparatus for drilling a mile or more down below the sea level that created millions of dollars in time savings for every well drilled, every well. They overcame enormous skepticism, skepticism that continued even after the invention had been disclosed to the public. They went against what the prior art taught, and they received critical and commercial acclaim. And the ultimate tribute, widespread adoption and copying of the dual activity apparatus by its competitors. Yet the district court in this case invalidated these patents for obviousness on summary judgment without ever considering many of those factors, including the secondary considerations, on the ground that they represented an obvious combination of art that had existed in this field since 1980 and 1989, respectively. That was reversible error on at least two grounds. First, the court made no mention of all of these secondary considerations. As this court recently wrote in the Crocs case from a couple of months ago, secondary considerations can be the most powerful evidence of non-obviousness. Here every one of the secondary considerations that this court has identified in its precedence is present here. We've rehearsed those in the brief. I won't repeat them except to say that this was an invention that was named by one magazine in the industry as one of the top 50 inventions and developments that shaped this industry over time. There's a prima facie case of obviousness that's made by the two references providing all the elements and explicitly providing the motivation to combine them, if that's the case. Is it rebut or overturn a prima facie case of obviousness? I think they can. And I think they can overcome it for exactly the same reason that a teaching away that's in the art can overcome that. And that is that it really tells you that, like KSR, for example. Well, a teaching away goes right to whether there is, in fact, a prima facie case. The secondary considerations are only used to sort of rebut it, right? I think that's generally the approach this court has used. And I think what you see here, Judge Moore, with respect to the state of this summary judgment record, is that you have in the art itself that was alleged to be combinable, you have a teaching in the Horn patent, for example. Remember, that's two stations working on two wells simultaneously. Horn says, and this you can find at 5202 of the UK application lines 94 to 100, Horn says if you're going to drill one well, you only need one station. Okay, that doesn't tell you that you can use two stations to drill one well. And then if you add the transfer equipment from one, which is what the district court did here, then what's the obvious combination there? Well, the obvious combination would be two wells, two drilling stations, two transfer stations working with each of those drilling stations. That would be the expected result, the predictable result, to use the KSR terminology. But what Transocean and its engineers came up with was an unpredictable result, which was two stations, one well. And why was this unpredictable? Well, one reason was that there was enormous concern in the art, both before and after, about two lines working simultaneously in the water, clashing with one another. That evidence was not considered by the district court. And that explains why in the prior art, like the Williford patent, which proposed this complicated riser system to try to deal with this issue and try to avoid any problems that might come from this. This is invention. I mentioned KSR before. I think a useful way of thinking about this case is the district court saw this as KSR. It's a mechanical invention. All the parts are out there. They're known. Somebody would have come along and put them together eventually. That's KSR. That's not this case. This case is a lot more like United States versus Adams, the companion case to Graham, which was discussed at some length in the Supreme Court's decision in KSR. That was the case. All the components were extraordinarily well known in the art, yet there was expert skepticism in teaching away. And the Supreme Court concluded, as a matter of law, that that was a non-obvious invention in Adams. That's what our case is. Now, let me turn, if I could. Let's turn to enablement. Yes. Assuming that we agree with you in obviousness. Where is the transfer means enabled in the way the means must function? Can you explain that for us? I think I can, Judge Gaiarsa. If you look, and the patents that are all at issue here have a common specification, so I think I'm giving you the right citations here. But if you look at figure 7. Sure. Any figure 7. Any figure 7. I'm using figure 7 on 069. 069, okay. Just as a matter of reference. Okay, if you turn to, I believe, that we are at the We're talking about 166 and 164. Right, what you'll see in column 7, and I know you're referring to figure 7, and then we turn forward to column 7. You'll see that the pipe handling apparatus. The first pipe handling apparatus. Second full paragraph, exactly. So, what you have disclosed and enabled in this patent is pipe handling apparatus on a rail. You also have a crane-operated handling apparatus. That's not disclosed in a picture, but it is described in the specification. On top of all of that, Judge Gaiarsa, what we are talking about here, rail-mounted pipe handlers and cranes, are well known in the art at this point. They're described. I think they're sufficiently enabled. What the district court found faulty with our case was that we didn't describe computer programming that was required for the commercial embodiment. But you'll look to the claims in the specification, and you won't find reference to computer programming as being a part of these claims. These claims, this is, I think another way to think about this, Judge Gaiarsa, is this case is not like the trilogy of cases that's been cited against us. The Citric against Riemork's case, or the automotive technologies case, or the Liebel-Flarscheim case. Those were cases where the claims were construed to cover two embodiments. For example, in Liebel-Flarscheim, a jacketed and a jacketless embodiment. And the specification only enabled the jacketed embodiment, and Judge Lurie, writing for the court, quite properly reminded the patent holder that you asked for this construction, you got it, and you should beware sometimes that you ask what you get for it. That you get what you ask for, excuse me. But this is not those cases. This is not a case where claims are so broad that they cover embodiments that aren't disclosed. The two embodiments that are set forth specifically are the rail-mounted pipe handlers, the cranes, and equivalents thereof. Now if the case is being made against us that the equivalents thereof aren't sufficiently enabled, then I think that argument basically reads the 112-6 equivalents out of the statute entirely. But I don't, I'm not entirely sure that that's the argument that's made against us, but if it is, it can't be right. Because even the equivalents are enabled by the disclosure of these other two structures. Because do the inventors generally have to know what their particular aspects of a means plus a function are actually being disclosed? Should they have the skill to know what they're disclosing? Did they admit that they didn't quite understand what the transfer means were at that point? I don't think that's... Implement the transfer means? I don't think that's a fair characterization of their testimony. As I read their testimony, I read it as talking about the work that had to be done to develop the first commercial embodiment of the structure, not to develop what is disclosed and claimed in the patent. Rail handlers, if you look, for example, at A-592 in the record, that's a VARCO paper on new ways of moving pipe around these rigs. Rail-mounted pipe handlers, crane pipe handlers, they've been known in the art for at least 10 years based on that description and probably more at this point. They've disclosed enough to say to the world, hey, this is how you do it. We've enabled it. And then reminding you, Judge Garris, that we're here on a grant of summary judgment. I understand, right. We have, against that, Mr. Boydachef's testimony, and you can find that at page 4897, where he says that it wouldn't be complex or take a lot of time to take these existing rail-mounted pipe handlers or other pipe handling equipment that's disclosed in his own patent, a 1986 patent, and adapt it to what is claimed in the Transocean patent. How much testing would be required? I'm sorry? How much testing would be required in order to establish the pipe handling system? Is there a way that that could be established? Obviously, this is a summary judgment. I think what you'd have to do then is what we've said the district court didn't engage in, and that's go through the WANs factors and determine how much they would take. They say, well, talking about our witnesses, that they talked about how difficult it was, and it wasn't easy for them to come up with the structure for the commercial embodiment. But against that, conflicting facts, they're a burden of clear and convincing evidence. Against that, we have, among other things, the testimony of Mr. Boydachef. Mr. Boydachef says, be trivial, wouldn't take a lot of time, it would be quite easy. Judge Mayer, I think I'm eating . . . am I reading the clock correctly? I don't want to be eating into my rebuttal time. Go ahead. We'll give you a rebuttal back. Okay. But I'm sorry, Judge Gaiarsa, you were speaking . . . He was essentially saying that this is a simple way to do it. Yes. It would be simple. It was known to web skills of the art. Without much support, though. Sorry? Without much support for that. Well, Mr. Boydachef was their expert. This is him. He's expert in the field. He had a patent in a related area, and he said this is not going to be hard. So is that proper for summary judgment? We say no. We say that the complete absence of any consideration of the WANs factors that really illustrates the failure of the court to address the enablement issue properly. Well, what about infringement, though? You have to win on all these things. You've got a mountain to climb here. What about infringement? Are you contending this is an offer to sell? We pled both. There was an offer. It was accepted, and that created a sale. But the offer was made in Europe. That's right. The offer wasn't made in the United States. That is technically correct, because that's where the party's representatives work. But if you look at the set of cases, the ROTEC, MEMC, TransCorp, LightCubes, even the court's more recent decision in SEV or SEB, I'm not entirely sure how that's supposed to be announced. If you look at those, you see a consistent theme running through those, and that is that the 271A requirement is that it's an offer to sell to the United States. It's not the offer that has to take place, Judge Moore, in the United States. It's the offer for sale into the United States. The sale would ultimately have to occur in the United States, which is what those cases address. But they don't actually address where the physical location of the offer needs to be. Right. And I think that's right. And I think the SEB case pointed out that this court has yet to develop the full contours of that area of the law. But again, the consistent theme that runs through these cases is the economic— I'm sorry. Suppose there was no sale at all. Suppose that somebody made an offer in Europe, but there was no actual sale because the person said, no, I don't want to buy this. Would that offer to sale being made in Europe infringe the United States' patent? It is an offer to sell to the United States. If it was the same offer that was made here, then I would say yes. And the reason I would say yes is that the offer to sell language of 271A is not directed at the technical question of where the offer territorially takes place. The language of 271A sure is offers to sell, or sells any patented invention, within the United States. Offers to sell within the United States. You're telling me I should say it means offering to sell within the United States, not the offer being in the United States. Exactly right. It is not offers within the United States to sell. And if this is the case to develop the contours of the offer to sell doctrine, that's fine. But we do have a sale. But suppose you, strategically, suppose you prevail on this offer to sale thing. You don't have any damages. I might not have any damages at that point. But I might not. Or in this case, I might be able to show, for example, price depression. Price erosion. That's what I thought. That's the only thing I could think of. Because you certainly don't get the sales. Because the ultimate sales that were made aren't for an infringement. And that may not be presented here. Because in fact, we do have a sale that actually did take place. There was an actual contract that was executed. I'm now past my time. Judge Mayer, thank you. Let's hear from Mr. Frankl. Thank you, Your Honor. Good morning, Your Honors. May it please the court. Maresk respectfully urges this court to affirm the lower court's rulings in their entirety. As to each issue decided by the lower court,  the lower court failed to properly apply the correct obviousness test. They ignored entirely the secondary consideration evidence. And our precedent, as well as the Supreme Court precedent, counsels that a court's not free to disregard that evidence in its entirety. If they had weighed it and come out differently, that's one thing. But they totally ignored it. We respectfully disagree with that, Your Honor. Show me where in the opinion they analyzed it. Well, what Judge Hoyt said was at A3, he said he had carefully reviewed all the pleadings on the motions. He said he also carefully reviewed the oral presentations. And the arguments were made during the oral presentations by both sides with respect to secondary considerations. And we believe they were considered and properly rejected for lack of sufficiency. Well, you say that. But there's no evidence of that. And in fact, his obviousness test is, quote, a two-part test for obviousness. Well, to that point. Neither of which includes anything about secondary considerations. Well, first, I wanted to address your first point, Your Honor. I don't believe that we can just assume that the court did not consider secondary considerations because he did consider and take into account the arguments that were made to him. Well, he was physically present. Certainly, we don't disagree with that idea. But it's not in here anywhere. And in fact, he articulates a two-part test for obviousness. Well, I think there is a two-part test. And I'd like to address that point, Your Honor. Graham v. John Deere simply says that secondary considerations might be utilized or that they may have relevancy. Even in the KSR case, the court repeated the Graham test and then went on and agreed with the district court's conclusion that teleflex in that case had shown no secondary factors to dislodge the determination of obviousness. Even more recently, this court, just in March, in the media technologies licensing case, restated the KSR and the Graham test and said, at that point, at that point, after reviewing the prior art, a court may consider secondary evidence of non-obviousness. Where in the Judge Hoyt's decision is there a consideration of the secondary aspects of obviousness? What does he state? I have considered the commercial success of this invention and totally disregarded. He does not say that, Your Honor. You are correct. And this court has held that that is not reversible error. Evidence of secondary considerations are only significant if there's a nexus, if it's been shown that there's a nexus between the claimed invention and the secondary considerations. And we respectfully submit that in any event, even if there were probative secondary considerations, they couldn't possibly overcome the strong prima facie case of obviousness in this case. And so you're correct that Judge Hoyt did not specifically say, I considered the secondary considerations. But I think it's fair to conclude that he did, based on his reasoned opinion and the fact that he specifically said, I considered the oral presentations that were made to me. And both parties addressed the secondary consideration evidence at that time. So again, this is a situation, in our view, where there's a very, very strong showing of a prima facie case of obviousness. And the judge, we believe, took them into account. I'd like to address the specific secondary considerations that were raised by Mr. Castanhas. He mentioned clashing as something that created skepticism in the industry. We think that's a red herring. The prior art did deal with that issue. There was the horn reference that had multiple strings in the water. Williford had multiple strings in the water. If clashing was such a big issue, Transocean could have talked about it in its patents. But it's mentioned nowhere. And Transocean doesn't point to any Transocean documents in the record that speak to the clashing issue. So we think that's just an after-the-fact argument of last resort. The industry praise argument, Mr. Castanhas referred to an article, which he said evidenced or listed top 50 inventions of all time, or whatever it was, in drilling. That's not what that document says at all. It's found at A40637. And it talks about 50 key events that shaped the offshore industry. It does list the introduction of the dual-activity drill ship of Transocean in 1999. But it also talks about the Alexander Keeland accident in 1980 and other events. So it's certainly not— But isn't all that questions of fact for the jury? What significance to give to those secondary considerations? Your Honor, we submit that there was no probative evidence offered on secondary considerations that created a nexus to the claimed invention and that was legally sufficient to overcome the strong case of obviousness, the strong prime facie case. The same can be said with respect to the alleged commercial success. Only little weight can be attributed to such evidence if the patentee doesn't demonstrate a nexus. And all the patentees did here was refer to a number of licenses, which, by the way, included a number of other patents around the world, not just the patents in suit, and again, didn't tie the invention. What's the invention here? It's adding pipe handling to a dual-drilling rig. And where does any of this praise, this commercial success, relate to pipe transfer? What about Merrif's copying? There is absolutely no evidence of copying in this case. But there's a memo. The only document that Transocean is referred to, Your Honor, is, I believe, at A5050-51. This is the only document they've pointed to. It's a Merrif's document which simply says, efficiency is key. Dual activity should be incorporated along with special development activities and new technologies. It mentions that there's the best known example of a dual activity vessel out there now is probably the drill ship of Transocean. This is not evidence of copying. This is not evidence of replication, like the court defines copying in the iron grip barbell case. And the evidence shows clearly that in this case, Merrif's built a semi-submersible drill ship where the pipe handling was on an entirely different level of the rig. This is very different than Transocean's drill ship, where all the pipe handling took place on the drill floor. This is not copying by any stretch of the imagination. So we discount that evidence. And we think the court did properly so as well. Mr. Frankel, what about enablement? Let's skip over obviousness. I think we have discussed that considerably. Is the fact that the district court only focused on the issue of programming for the enablement factors sufficient to support your position that the invention is not enabled? Even though the transfer means that we're talking about really are mechanical means, not programming means? Your Honor, I think what the court was picking up on with the reference to programming was the inventor's own testimony, where they listed all the types of things that would have to be incorporated to come up with a working pipe handling system. I don't think he was focusing on programming as the end all and be all. What I think he was saying was that it's one of the factors that you could look to to show how to make this transfer means work to perform the function. This was means plus function language in several of the claims. One of the claims was an assembly to transfer in claim 17 of the 069 patent. But even there, the court interpreted it as requiring the same function, which was this transfer means has to facilitate simultaneous drilling. You have to tell how you do that. You can't just point to a figure. It's the same thing as in the auto technologies case. Sure, there was a picture of an electronic sensor, but that was a very vague description. And that's what we have here, a vague reference to a rail or a vague reference to an overhead crane. What degree of specificity do you need in the written description in order to enable? You have to be as specific as you're asking for. There has to be a rail that has to be established, a transfer means that needs to be established specifically. Well, we have three inventors. Isn't figure 7 sufficient to establish enablement? Figure 7 is not sufficient to establish enablement, and all the inventors said as much. Why not? Figure 7 is just a rail. And what the inventors claimed was that they had some pipe transfer system that was distinguishable from the one reference and was different than the prior art. And they claimed that there was something very special about this. We asked each of the inventors, what's so special about this pipe handling system? They said, it's very complex. Mr. Scott said, we didn't describe specifically how to design or implement a pipe handling apparatus in our invention. He said, the software system proved problematic for Varco, the company that actually made it. Mr. Herman said, there's no pipe handling assembly described in our patent. But if I understand it correctly, isn't the software that we're talking about a means by which the two-pipe handling system can be integrated to operate? That's correct, Your Honor. The witnesses had testified that the pipe handling, because of the distances involved, required a lot of coordination and programming. The top of the rail would coordinate with the handler at the lower rail to transport this pipe in case it torqued in one direction or another. They talked about other things that would be required. And we've identified those in our brief at, I can tell you, at the red brief 19 through 20 and thereabouts. And also, if I might, just address two points briefly that Mr. Castanhas made on this. One, he referred to Mr. Boydjadeff's testimony. That's our expert. And if Your Honor wants to know how to describe a pipe handling system, I refer you to one of Mr. Boydjadeff's 40-some-odd patents or to the Lund patent to see what's actually required to enable this equipment. But he said it was pretty simple, though, didn't he? Well, no. What he was asked specifically about another of his patents, he was asked, you have a rail here that moves from point A to point B. If we asked you to move the rail from point A to point C, would that be a difficult task? And he said, no, that would be trivial. They didn't ask him to enable a pipe handling system. And Transocean can't rely on the level of skill in the art to supplement and fill in the gaps in a deficient disclosure. Wait, why not? That's exactly what enablement's all about. You only disclose what's new. And you would do, absolutely, do exactly what you said they can't do, which is rely on the level of skill in the art and the prior art. If things are known, you don't have to disclose them. Well, we disagree with that, Your Honor. We think it's the requirement of the patentee to enable the novel aspects of the invention by describing them in their specification. It's not the knowledge of persons skilled in the art. That's what the auto technologies case tells us. Wait, why do you say the novel aspect is the transfer means? I don't find that to be. I find the novel aspect to be the combination. Your expert and their expert both agree that all the component parts are present in both London horn. I mean, so the novel aspect is putting it all together. So why do they have to disclose pipe handlers in particularity when that is well-known in the art? What about a crane? Just put a crane over these things. Lift the pipes from one platform to the other. How hard is that? Well, we agree it would be obvious, but apparently it was hard for these inventors. They claim that- No, because their commercial embodiment was hard for these inventors. These inventors didn't say the concept was hard. These inventors say that they did not know how to make, use, or sell this invention. They had to go to Barco, a vendor that was a specialist in pipe handling equipment. It took them months to create the equipment, and the inventor Ray said it wasn't easy for Barco. Isn't there a crane disclosed in the spec? The spec says crane can be used, right? A crane. So isn't that one enablement such that- Now, you may have an argument when you say the full scope of their claims that they're going to try and cover other things. Maybe that's a different argument, but why doesn't just the disclosure of a crane enough forget everything else, enough to enable the claims at least for use with a crane? Because there's nothing in the specification that tells us how to implement that crane in a way that accomplishes the function that is part of that claim element, which is to facilitate simultaneous drilling operations. I don't understand. The crane just picks up pipe from one place and moves it over to the other. That's what's disclosed. I agree with you. It's obvious, Your Honor, but the point is- But it's not only obvious, it's disclosed. They said you can use a crane to move these things from one place to the other. So how much, I guess what, do you have to have the operator in there too who's going to be running the crane? I don't understand what the something more is that needs to be in. The inventors described what that something more was, and I see if I can find it for you, Your Honor. It's at pages 47 to 51 of the red brief. They said that they would need to know about software that had never been done before. They would have to look at the weight that the system could handle. They would have to look at the speed it could travel, the hoisting range that was needed, the size of the tubular that could be handled, capability to rotate without friction when they were making up pipe, all of these things. But can all of that be decided on summary judgment? That's the question. Well, it can easily, this case can easily be decided on enablement and summary judgment because, like in other cases that this court has decided, Ornco, Auto Technologies, Liebel-Flarsheim, National Recovery, the inventors in all those cases like here admitted that they didn't know how to make, use, or sell the invention that they were claiming. Your Honor, my time is limited, and I'd like to address the infringement question if I might. I first want to say that, first and foremost, this is not, this is a drilling services contract. And on that basis alone, this case is unique and can, I think, easily be distinguished. If I take a taxi from the National Airport over to the court here, I didn't buy that taxi. I'm using the services of the taxi and the taxi driver. And the same thing has happened here. This whole Statoil contract that's at issue is a contract to provide drilling services. And I point the court to A7171, Article 4.3. It says, the overall performance of the work, the management and direction of the drilling unit, and the company provided equipment, personnel, and subcontractors shall be the sole responsibility of the contractor. In this case, Statoil never owns the rig. They didn't control the rig. So our contention initially is that this isn't a sale of a product, number one. Number two, this is a rig that was being built and wasn't yet completed for a couple years after the contract was entered into. And that cannot constitute a sale because there wasn't availability of the product to be delivered. Third, as for the offer for sale, we concur that the offer took place under the essential activities test of MEMC completely outside the United States. And it would be inappropriate to apply U.S. law in that context. So for all those reasons, and the fact that if you look at the agreement itself, what Maersk did at the time that they entered into this agreement, this is a company that's building not widgets or light cubes or toasters to send in the United States en masse. This is a company that's building a $600 million rig in Singapore. It's a Danish company, and they want to deploy that rig in any one of a number of places around the world. And including the United States. Including the United States. And when Statoil came to them and said, a Norwegian company said, we'd like to use your rig for four years in the Gulf of Mexico, Maersk said in the response to the tender offer and in the contract that they ultimately entered into, they said, okay, but we may have to change the configuration of that rig depending on what happens with these trans-ocean patents that are in litigation right now with Global Santa Fe. And so they reserved the right, the exclusive right, to modify the rig if they had to. And in fact, as we all know, they did modify the rig. They put a casing sleeve, a permanent fixture on the rig so that it could never be operated any way, shape, or form near what trans-ocean was claiming as its dual drilling operation. So in every instance, we think the judge, the district court, was properly entirely correct in concluding that there was no offer for sale, no sale in the United States of an infringing rig. I believe I've addressed the comments I wanted to make. Unless the court has any further questions, we would rely on our briefs on the remaining issues. All right, thank you. Thank you, Your Honors. Thank you. Judge Daniels. Thank you, Your Honor. I think I can be brief. With regard to obviousness, the case is made that there's no nexus between our invention, which is the, as Judge Moore, you recognize the combination that yields an apparatus capable of dual activity. Everything in the secondary considerations is directly related to the cost savings related to dual activity. I don't think I can say it more clearly, and I think our briefs say it absolutely clearly. The comment about there being no, absolutely no evidence of copying, section of page 850.50, which is a confidential page, I don't want to be out loud. I'm sorry? Would you mind talking about enablement? I'll get to that. I just want to point out that with regard to copying, the entire paragraph that's at the top of 850.50 tells a different story. With regard to enablement, the evidence that's being cited against us, not only is disputed, but it also is evidence that goes not to the invention claimed in the patent, but to the special problems of dealing with a commercial embodiment. And Judge Moore, I point you to page A3992, which is the testimony of Inventor Scott. And there he's talking about where some of the problems with the commercial embodiment, the Discoverer Enterprise, came. And they came because of the massive scale of the ship, the specific ship that was being built. The comment Judge Gaiarsa made about Mr. Boydiceff's patents, and the suggestion was,  how to build rail-mounted equipment, go look to Mr. Boydiceff's patents. Well, that's exactly what a person of ordinary skill in the art would do and can do under the enablement law of this circuit. You can go to look at the excruciating detail that's been provided in these 10-year-old patents, and they'll give you the detail. That's why Mr. Boydiceff said it wouldn't be a difficult thing at all. And also, with respect to Figure 7, the claim was made that that showed just a rail, and that's not correct. It shows a pipe handler with a modified rail that extends between the stations. So Judge Moore, what that's doing is it's showing how to implement the rail handler to make this new inventive combination. Lastly, with regard to the infringement questions, my friend on the other side said that Article 4.3 says that this is a contract that is a, it's a leasing contract. He analogized it to going out and catching a taxi. Well, again, this court has looked to form over substance, and the simple fact is that this is a four-year contract extendable to six years that gives that where Maersk provides, that's the term that's used at A7209 Section 3.1, the rig, but it is Statoil, the buyer, as we would see it, who uses the rig for this extended period of time. And in the area of software licenses- How is this a sale, though? They didn't actually sell a rig that infringes. They sold one capped off. Well, of course, we have, we think that the capping off doesn't defeat infringement, but- But then you've got collateral estoppel problems, so- No, I would dispute that we have collateral estoppel, but I'll accept that for purposes of our discussion here. I just don't want, I don't want you to think that I agree that a- I understand you don't agree with anything that happened below. Go ahead, keep going. With the, but with respect to the cap, the collateral estoppel problem would only arise, first of all, that's the actual rig that was sent, and it was sent after, by the way, the schedule was in. So how is it the sale of something infringing? It was the sale of something infringing because it contains all of the elements. The addition of an additional element to a claim does not defeat infringement. It's still got the same elements. The cap can be taken off. There's no- No, what was sold doesn't infringe. Just accept that as my hypothetical. I'll accept that for purposes of this discussion. What was sold does not infringe. So the ultimate thing received, so how do we have a sale under 271 if the thing received by the customer absolutely does not infringe? There is definitely a sale if there's a question of whether that thing infringes, then we've accepted that. It doesn't infringe. And of course the cap was not considered, it was not implemented until after the contract. So if we say the sale is complete and they've made that sale and maybe they've now made a sale with something that can't work in the way that the patent does. But the simple fact is that the thing they sold, the thing that was contracted for was a dual activity machine. That is a sale. It took one sale away from us perhaps and certainly put competition into the Gulf of Mexico against us. That sounds like a sufficient answer. That sounds like it. Thank you very much. Thank you.